**BOARD OF DIRECTORS, WATER'S EDGE, A CONDOMINIUM UNIT OWNER'S ASSOC., Plaintiff,**

v.

**The ANDEN GROUP, Defendant/Third–Party Plaintiff,**

v.

**HOOVER TREATED WOOD PRODUCTS, INC., et al., Third–Party Defendants.**

Civ. A. No. 89–1063–A.

United States District Court, E.D. Virginia, Alexandria Division.

March 28, 1991.

Robert G. Watt, McLean, Va., for plaintiff.

Bernard DiMuro, DiMuro, Ginsberg & Lieberman, Alexandria, Va., for Curtis Lumber.

Charles E. Gallagher, Jr., Upper Marlboro, Md., for Fort McHenry Lumber Co., Inc.

Robert L. Ellis, Fairfax, Va., for Hoover Treated Wood.

John J. Fisher, Odin, Feldman & Pittleman, Fairfax, Va., for The Anden Group.

Paul Terpak, Blankenship & Keith, Fairfax, Va., for Maryland Lumber Co.

Edward H. Grove, III, Fairfax, Va., for Osmose Wood Presser.

Randolph Frostick, Manassas, Va., for Lowe's Home Ctr.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

Where a purchaser sues a seller alleging that the product sold is defective, the seller typically denies the product's defectiveness, but also contingently impleads its source of supply for the product or the product's manufacturer. In these circumstances, the seller must prepare two positions. Against the purchaser, the seller must prepare the position supporting the product's nondefectiveness. Against the impleaded parties, the seller must contingently pursue the opposite position. It is easy to see, then, that in the course of discovery queries aimed at establishing the product's defectiveness or lack thereof may present the seller with a dilemma. This is just such a case.

Plaintiff's post-judgment motion for attorney's fees presents the question whether defendant here properly refused to admit the defectiveness of the product in issue. Specifically, plaintiff contends that defendant violated Rules 11, 26(g) and 37(c), Fed.R.Civ.P., by failing to admit the following: (i) that certain fire retardant treated plywood ("FRT plywood") defendant used in constructing condominiums for the plaintiff was defective, (ii) that the FRT plywood had deteriorated within two years of construction of the condominiums, and (3) that the FRT plywood had deteriorated to the point that replacement was required by the time of suit. Because defendant at the time had reasonable grounds on which to deny the defectiveness of the FRT plywood and to deny deterioration within two years of construction, attorneys fees for proving these matters are denied. Fees are granted, however, with respect to proving that the FRT plywood had so deteriorated by the time of suit that it needed to be replaced. No reasonable ground existed for denying this requested admission.

The lesson, then, is that a defendant in these circumstances may proceed to prepare and defend two inconsistent positions, but once certain facts become unequivocally established, *i.e.*, the FRT plywood deterioration in the roof, it must admit this objectively observable fact when properly requested to do so even if doing so would undermine or scuttle one of its positions. But the cause of the product's deterioration stands on a different footing; it is not so much an objectively observable fact as it is a matter of expert opinion. Thus, a defendant may decline to admit the defectiveness of a product, even though some objective facts may suggest otherwise, provided there are reasonable grounds for the denial.

### Factual Background and Proceedings

Plaintiff, the Board of Directors of Water's Edge, a condominium unit owners' association ("Water's Edge"), filed a complaint on July 24, 1989, charging defendant, The Anden Group ("Anden"), with having improperly constructed certain roofs at Water's Edge. The complaint alleged that leaks existing in the roofs at Water's Edge were "caused by construction and/or design defects attributable to Anden's construction of the Water's Edge roofs." Complaint at ¶ 12. Anden denied allegations of defects in the roofing, noting that it could neither admit nor deny these allegations without more information from Water's Edge. Further discovery between Anden and Water's Edge took place in October and November. This discovery clarified the fact that one of Water's Edge's claims was that the roofs were defective because certain FRT plywood used by Anden to construct the roofs had been improperly manufactured and was itself defective. In light of this, Anden was granted leave to file a third-party complaint against numerous third-party defendants, including Hoo-

ver Treated Wood Products, Inc. ("Hoover"), the manufacturer of the FRT plywood, and Maryland Lumber Company ("Maryland Lumber"), a major supplier of the FRT plywood.

Trial commenced on April 23, 1990. On that day, Anden stipulated that most of the roofing at Water's Edge would have to be replaced and that Anden was liable for the cost of such replacement. The only two issues remaining between Water's Edge and Anden were whether Anden was also liable for replacing five small items, including chimney caps, gutters and waterspouts, and the total amount of damages for roof replacement. The trial proceeded on these issues to a jury verdict awarding Water's Edge $460,000. After this trial, Anden and the third-party defendants proceeded to trial on the issue of whether the deterioration of the FRT plywood in the roofs was attributable to defective plywood or to Anden's alleged faulty construction practices. Before completion of this second trial, the defendants reached a settlement as to liability. On May 4, 1990, Water's Edge filed its Motion for Award of Litigation Costs Incurred to Prove Failure of Fire–Retardant–Treated Plywood. In the motion, Water's Edge sought attorney's fees as well as costs, based on numerous legal theories. The Court denied the motion but gave Water's Edge leave to renew the motion once certain proceedings between Anden and third-party defendants Hoover and Maryland Lumber concerning Rule 11 sanctions had been completed. A Rule 11 sanctions hearing was held on December 3 and 4, 1990, during which Anden reached a settlement with Hoover and Maryland. Water's Edge has now renewed its motion for attorney's fees. Water's Edge also filed a Bill of Costs setting forth specific expenses other than attorney's fees, which has been disposed of in a separate memorandum opinion.[1] Disputes over the motion for attorney's fees have been fully briefed and argued, and the matter is ripe for disposition.

1. *See Board of Directors, Water's Edge, A Condominium Unit Owner's Association v. The Anden*

*Analysis*

■ Water's Edge argues that Anden's responses in its Answer and to certain interrogatories and requests for admission violated Rules 11, 26(g), and 37(c), Fed.R. Civ.P. Rule 11 mandates in relevant part that an attorney's signature on any

> pleading, motion, and other paper ... constitutes a certificate by the signer ... that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law, or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

As other courts have recognized, "Rule 11 addresses two separate issues: one, the problem of frivolous filings, and two, the problem of improper purpose." *Meadow Ltd. Partnership v. Heritage Savings & Loan Association*, 118 F.R.D. 432, 433 (E.D.Va.1987), *aff'd Fahrenz v. Meadow Farm Partnership*, 850 F.2d 207 (4th Cir. 1988), citing *Zaldivar v. City of Los Angeles*, 780 F.2d 823 (9th Cir.1986), *cited in Stevens v. Lawyers Mutual Liability Insurance Co.*, 789 F.2d 1056 (4th Cir.1986). In this context, a frivolous claim is one unsupported in fact or law whereas a claim filed for an improper purpose is one shown by objective evidence to have been filed for an improper purpose such as to harass, delay or increase costs. *See Zaldivar v. City of Los Angeles*, 780 F.2d at 830–32. Water's Edge makes no claim of improper purpose; hence, no further analysis of Rule 11's second prong is required. With respect to the first prong, Rule 11 imposes on an attorney an affirmative "duty to conduct a pre-filing examination of both the facts and the law." *Cabell v. Petty*, 810 F.2d 463, 467 (4th Cir.1987); *accord Meadow Ltd. Partnership*, 118 F.R.D. at 433. The standard applied to this duty is one of objective reasonableness:

*Group*, 135 F.R.D. 129 (E.D.Va.1991).

If an attorney's conduct appears to fall within the scope of Rule 11, the court must first examine the actions at issue according to a standard of objective reasonableness. At this stage, the inquiry focuses only on whether a reasonable attorney in like circumstances could believe his actions to be factually and legally justified. If the standard of objective reasonableness is unsatisfied, sanctions are mandatory.

*Cabell v. Petty,* 810 F.2d at 466; *accord Fahrenz v. Meadow Farm Partnership,* 850 F.2d at 210; *Stevens v. Lawyers Mutual Liability Ins. Co. of North Carolina,* 789 F.2d at 1060. Rule 11 sanctions most often arise in cases involving an inadequate legal basis. "Situations where sanctions are appropriate for inadequate factual inquiry are less frequent, but they do occur." 2A *Moore's Federal Practice* ¶ 11.02[3] at 11–22 (2d ed. 1987).[2] Rule 26(g) applies specifically to "[e]very request for discovery or response or objection thereto." Rule 26(g), Fed.R.Civ.P. It applies to "answers to interrogatories and to requests to admit as well as responses to production requests." *Id.,* Notes of Advisory Committee on Rules: 1983 Amendment. The rule mandates that all such pleadings be signed, and that an attorney's or party's signature on such a pleading "constitutes a certification that ... to the best of the signer's knowledge, information, and belief formed after reasonable inquiry" the pleading is (i) consistent with discovery rules and warranted by existing law or a good faith

modification thereof, (ii) not interposed for any improper purpose and (iii) not unreasonably or unduly burdensome. *Id.* The requirements of Rule 26(g) are "very similar to those found in Rule 11.... While discovery motions are governed by ... Rule 11, discovery requests, objections, and responses must conform to the more detailed standards of Rule 26(g)." 4 *Moore's Federal Practice* ¶ 26.86 at 26–569, –570. Rule 26(g) imposes a duty to conduct a pre-filing investigation; the reasonableness of this investigation is measured by an objective standard. *Id.* at 26–570. Furthermore, Rule 26(e) imposes a duty on parties, under certain circumstances, to supplement discovery responses where a party or its attorney subsequently discovers that a response is inaccurate.[3]

Rule 37 states in relevant part that if a party refuses to admit the truth of a matter and the party requesting the admission subsequently "proves the ... truth of the matter," the party requesting the admission may recover the reasonable costs of proving the matter. A court is to award such costs unless "the party failing to admit had reasonable ground to believe that the party might prevail on the matter...." Rule 37(c)(3).

The requests and queries to which Water's Edge points fall into three categories: (i) those requiring an admission that the FRT plywood was defectively manufactured or that construction defects caused

---

**2.** *See, e.g., Albright v. Upjohn Co.,* 788 F.2d 1217, 1221 (6th Cir.1986) (sanctions granted where plaintiff filed complaint despite lack of any evidence that defendant drug manufacturers produced drugs taken by plaintiff); *Mossman v. Roadway Express, Inc.,* 789 F.2d 804 (9th Cir. 1986) (sanctions imposed when attorney filed motion for summary judgment without supporting affidavit); *Frazier v. Cast,* 771 F.2d 259 (7th Cir.1985) (no facts existed to support claim that warrantless search was justified by exigent circumstances); *Meadow Ltd. Partnership,* 118 F.R.D. at 434 (sanctions imposed where counsel pressed claim despite fact that own witnesses changed stories and gave inconsistent testimony during depositions).

**3.** Rule 26(e) provides that a party is under no duty to supplement discovery responses that

were complete when given except in three specific circumstances. First, a party has a duty seasonably to supplement responses pertaining to the identity of persons having knowledge of discoverable materials, or to the identity of expert witnesses and the subject matter and substance of their testimony. Second, a party has a duty to amend responses when information comes to its or its attorney's attention that shows that a response was really incorrect when made or, if correct when made, "no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment." Rule 26(e)(2)(B), Fed.R.Civ.P. Third, a duty to supplement may be imposed by court order, agreement of the parties, or through new requests for supplementation of prior responses. *See* Rule 26(e), Notes of Advisory Committee on Rules: 1970 Amendment.

the FRT plywood to deteriorate,[4] (ii) those requiring an admission that the FRT plywood had deteriorated to the point of being unsafe within two years of construction,[5] or (iii) those requiring an admission that at the time of suit the FRT plywood had deteriorated to a point requiring replacement.[6] Each category is separately treated.

## I. *Manufacturing or Construction Defects as Cause of Deterioration*

■ Water's Edge contends that Anden's failure to acknowledge either manufacturing or construction defects in the FRT plywood roofing violated Rules 11, 26(g) and, in particular, 37(c). With respect to construction defects, Anden never admitted, nor was it shown at trial or in any post-trial hearing, that construction defects caused the deterioration of the plywood. Indeed, against both Water's Edge and the third-party defendants, Anden steadfastly maintained that construction defects did not contribute in any significant fashion to the deterioration of the FRT plywood. As the existence of construction defects was not established at trial, Rule 37(c) is inapplicable. Furthermore, even if Anden's stipulation as to liability on the first day of trial were deemed to be an admission of faulty construction, no Rule 37(c) sanctions are warranted as the record shows that Anden had grounds until the date of trial to believe that inherent manufacturing defects, not construction defects, caused the deterioration.[7] Furthermore, Water's Edge has not pointed to any evidence of construction defects known to Anden that would render Anden's responses on this issue violative of Rule 11 or 26(g). As noted, the record shows that Anden and its

counsel had a reasonable factual basis for denying that construction defects had caused the deterioration.

■ The Court also rejects Water's Edge's contention that Anden's failure to acknowledge manufacturing defects in the FRT plywood violated Rules 11, 26(g) and 37(c). Water's Edge argues that because Anden diligently gathered evidence tending to show that the FRT plywood had been chemically treated in a defective manner, and because Anden intended to press the position in pursuit of the third-party complaint against the suppliers and manufacturers of the FRT plywood, Anden violated Rule 37(c) when it failed to admit the defectiveness of the plywood in response to requests for admission. Water's Edge argues further that these actions violated the duties imposed by Rules 11 and 26(g) to thoroughly investigate before answering a complaint or interrogatory. These contentions are erroneous for several reasons.

As previously noted, Rule 37(c) applies only when the requesting party "proves the ... truth of the matter." Under the somewhat unusual facts of this case, it was not proved, either at trial or in post-trial proceedings, that the FRT plywood at Water's Edge was treated with chemicals in a defective manner. On the opening day of the first trial, Anden stipulated that it was liable "as to the replacement of almost the entire roofs here with the exception of five items." Transcript of Proceedings, Vol. I at 6. Anden never admitted at trial, nor was it ever proved, that the roofs needed to be replaced *because* the FRT plywood was defectively manufactured.[8] Indeed, after

---

4. *See* Complaint ¶¶ 13 & 14 (alleging construction and manufacturing defects); Plaintiffs' Second Set of Requests for Admissions, dated December 29, 1989, at ¶¶ 18–19 (seeking admissions of construction defects); Interrogatories of Lowe's Home Centers, Inc., dated April 11, 1990, No. 3 (seeking information on all repairs allegedly related to defective FRT plywood).

5. *See* Plaintiffs' Second Set of Requests for Admission, dated December 29, 1989, at ¶¶ 15–16.

6. *See* Plaintiffs' Second Set of Requests for Admission, dated December 29, 1989, at ¶¶ 13 & 14.

7. For example, Anden had retained experts during the discovery period whose opinion was that the FRT plywood had deteriorated as a result of internal manufacturing defects, not construction defects. *See* Anden's Supplemental Answer to Interrogatories of Water's Edge served March 21, 1990; testimony of Anden's experts at the December 3–4, 1990 hearing.

8. *See* Transcript of Proceedings at 47 (Anden stating that "we would agree, without admitting responsibility—because we believe it's the manufacturer's responsibility—that the remainder of the roof needs to be replaced"); *id.* at 59 (the Court noting that "[i]n other words, they're stip-

Anden stipulated to liability for replacing the roofs, Anden and the third-party suppliers and manufacturers continued to dispute whether the FRT plywood needed replacement because it had been defectively manufactured or because Anden had used faulty construction techniques in building the roofs.[9] This dispute was never formally resolved in Court as Anden and the third-party defendants reached a settlement as to liability and, later, in the course of a hearing held on December 3–4, 1990, also settled their dispute over Rule 11 sanctions and attorneys fees. In sum, in the peculiar context of this litigation, all claims as to liability were resolved or settled without ever litigating the question of the defectiveness of the FRT plywood.

■ More importantly, even had the defectiveness of the product been established at trial, or even deeming Anden's stipulation of liability as an admission of a manufacturing defect, imposing on Anden the costs of establishing the truth of this matter would not be warranted. Rule 37(c)(3) states that the court should not grant such costs when it finds that "the party failing to admit had reasonable ground to believe that the party might prevail on the matter." *See ARB Inc. v. E–Systems, Inc.*, 663 F.2d 189, 200 (D.C.Cir.1980) (holding that losing party's failure to admit certain matters in breach of contract dispute fell squarely in exception (c)(3)); *Dyer v. United States*, 633 F.Supp. 750, 753 (D.Or.1985) (holding that the government "had reasonable ground to believe that it might prevail on the matter" of whether wake turbulence caused airplane crash), *aff'd on other grounds*, 832 F.2d.1062 (9th Cir.1987). The

Court concludes that Anden had reasonable grounds to believe that the FRT plywood might be found at trial to be free from defects. Included in these grounds were the manufacturers' claims that the FRT plywood had been used in thousands of sites where no problems with the plywood had been reported. The manufacturers contended that any degradation of the plywood was the result of faulty construction techniques employed by Anden. They continued to assert these claims during the hearing of December 3–4, 1990, well after the April 23rd liability trial between Anden and Water's Edge. Water's Edge itself continued to assert until trial that the FRT plywood had failed as a result of faulty construction, as well as defective manufacture.

Furthermore, it appears that Anden may have been willing to stipulate to liability for replacing the roofs at the start of trial on April 23rd because it had reached a tentative settlement on how to apportion such liability with the third-party defendants.[10] Anden's willingness to stipulate liability appears in some measure attributable to the success of its negotiations with Hoover, not to any evidence in its possession that indisputably showed that the FRT plywood was defectively manufactured. Proving that the FRT plywood failed because of heat-induced chemical reactions occurring within it and not for other reasons is a complex and contested factual matter. In sum, the Court finds that Anden possessed reasonable grounds to believe the trial jury could find that the FRT plywood was not defective. In these circumstances, Anden properly declined to ad-

---

ulating that the roof with certain exceptions needs to be replaced and that they're responsible for doing that"); *id.* at 60 (statement of third-party defendant Hoover's counsel).

**9.** *See* Transcript of Proceedings at 60 (counsel for Hoover explaining: "Both parties, Anden and Hoover, agree that the FRT plywood needs to be replaced in this case at this Water's Edge. The dispute has been what caused it: are they due to construction defects or is it a product failure. That dispute rages on. But for purposes of this trial, we would stipulate that the shingles and the felt pad underneath it and the FRT should be replaced").

**10.** Anden and Hoover indicated on the first day of trial that they were close to settlement and that once the jury determined the total amount of damages owed to Water's Edge, Anden and the third-party defendants would likely settle their claims as to liability for the judgment. *See* Transcript of Proceedings at 13 (remarks of John Fisher, Anden's Counsel); at 55 (same); at 62–63 (remarks of Robert Ellis, Hoover's Counsel, indicating that the major obstacle to a complete settlement between Anden and the third-party defendants was the issue of indemnification for litigation costs and not liability for any judgment in favor of Water's Edge).

mit defectiveness and sanctions are therefore unwarranted. Other courts have reached the same result in analogous circumstances. *See Dyer v. United States*, 633 F.Supp. at 759 ("the issue of the time it takes for wake turbulence from a helicopter to dissipate is a difficult factual question. The Court finds that the government had reasonable ground to believe that it might prevail on the matter"); *United States v. Article of Drug*, 428 F.Supp. 278, 281 (E.D.Tenn.1976) (finding that exception of Rule 37(c)(3) applied where issue of whether "articles of drug were 'new animal drug' involved complex issues of both fact and law").

■ Moreover, the acts of Anden relied on by Water's Edge are acts that would typically be taken by a defendant asserting inconsistent defenses in a third-party complaint or in a cross claim. While denying that the FRT plywood or its own construction techniques were defective, Anden reasonably and prudently had to prepare for the contingency that it might not prevail against Water's Edge's claims. Accordingly, Anden sought evidence and expert testimony to prove its contingent claim of defectiveness against the third-party defendant manufacturers and suppliers. In answering interrogatories, Anden openly admitted that various of its experts, if called, would testify that the FRT plywood was defective and failed in high temperatures. The Court is convinced, however, that the evidence collected by Anden was not so clear and decisive as to eliminate a reasonable belief by Anden, based on the data outlined above, that the product could be found nondefective at trial.

■ Finally, the Court notes that Water's Edge's cited authority, *Chemical Engineering Corp. v. Essef Industries, Inc.*, 795 F.2d 1565 (Fed.Cir.1986), is distinguish-

able. There, the Court upheld a district court's imposition of costs for failure to respond properly to a request for admissions. At issue there was a patent infringement claim pertaining to a water treatment process patent. An important feature of the patented treatment was its tendency to raise the pH level of the water. Essef, the defendant, sought an admission from Chemical Engineering, the patentee, that Essef's allegedly infringing device did not raise the pH level of water. Chemical Engineering denied this despite having conducted tests of its own showing that Essef's technique did not raise the pH level. The Federal Circuit agreed with the district court that this response was improper. The patentee was in possession of unequivocal, objective factual information, namely the pH test. This information necessitated an affirmative response, particularly in light of the wording of defendant's requests for admission, which merely summarized the test results achieved by both plaintiff's and defendant's experts and asked that Chemical confirm these results. *Id.* at 1575. Significantly, the Federal Circuit noted as a basis for its holding that the pH test results "did not require admission of unpredictable events, and were not complex." *Id.* In contrast, the admission sought here, namely that the FRT plywood used at Water's Edge was defectively manufactured and that such defect had caused the failure of the roofs at Water's Edge, involved numerous complex technical facts and legal conclusions. Furthermore, unlike the patentee in *Essef*, Anden here had reasonable grounds to deny the requested admission. This finding requires rejection of Water's Edge's Rule 11 and Rule 26(g) claims, as well as its Rule 37(c) claim, pertaining to failure to admit defective manufacture.[11]

---

**11.** Water's Edge maintains that Rules 11 and 26(g) impose a continuing duty to amend an answer or discovery response that subsequent to filing is shown to be incorrect. Circuit courts are split as to whether Rule 11 imposes a continuing duty. *Compare Stiefvater Real Estate, Inc. v. Hinsdale*, 812 F.2d 805, 809 (2d Cir.1987) (holding that Rule 11 imposes no continuing duty); *Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2d Cir.1986) (same), *cert. denied, Suffolk Co. v.*

*Graseck*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987); *and Thomas v. Capital Security Services*, 836 F.2d 866 (5th Cir.1988) (same and abrogating prior Fifth Circuit cases holding the opposite) *with Herron v. Jupiter Transp. Co.*, 858 F.2d 332, 336 (6th Cir.1988) (holding that Rule 11 imposes continuing duty) *and Flip Side Productions, Inc. v. Jam Productions Ltd.*, 843 F.2d 1024, 1036 (7th Cir.1988) (upholding Rule 11 frivolous claim where uncovered during dis-

## II. *Failure Within Two Years*

▮▮ Several of the requested admissions relied on by Water's Edge were aimed at compelling Anden to concede that the FRT plywood at the condominium complex had deteriorated within two years of construction.[12] Anden conveyed the first unit of Water's Edge on July 25, 1984.[13] The Complaint was filed July 24, 1989, some three years after the two-year period for which admissions were sought. The Court finds that Water's Edge has not pointed to facts in the record showing that Anden had reason to know that the plywood had deteriorated to unsafe conditions within two years of construction and conveyance. Moreover, the record shows that Anden "had reasonable ground to believe that [it] might prevail on the matter." Rule 37(c)(3). Evidence was presented at the December 3, 1990 hearing indicating that manufacturing, rather than construction, defects may have caused the FRT plywood to deteriorate. At the same hearing, however, there was conflicting evidence as to whether weather conditions alone might cause FRT plywood to deteriorate and, if so, how rapidly this deterioration might occur. Given these circumstances, Anden had reasonable grounds to believe it could prevail at trial on this issue, and no Rule 37(c) violation has been shown. Also, a reasonable attorney in Anden's position could believe that the denial of deterioration within two years of construction was factually justified. Hence, no violation of Rules 11 and 26(g) has been shown.

## III. *The Deteriorated Condition of the Plywood*

▮▮ Some discovery requests at issue relate solely to whether, at the time of filing of this suit, the FRT plywood at Water's Edge had deteriorated to an unsafe state and needed to be replaced.[14] These requests for admission were propounded on December 29, 1989, and Anden responded, by denying them, in mid-January, 1990. Water's Edge claims that Anden should at least have admitted that the plywood had deteriorated for some unspecified reason and needed to be replaced. This claim has merit, although it is unclear on the present record precisely when Anden had knowledge that the plywood had deteriorated and required replacement. Determining whether the plywood had deteriorated and needed to be replaced required only that Anden inspect the roof at the Water's Edge complex. Anden admits that on January 19, 1990, representatives of Wiss, Janney, Elstner Associates, Anden's retained experts, toured Water's Edge and took samples of the plywood. At the December 3–4, 1990 hearing, experts from Wiss, Janney testified that these samples showed that the plywood at Water's

covery established that complaint was baseless), *cert. denied*, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). The Fourth Circuit does not appear to have decided this issue. Nor is it necessary in this case to reach this question. With respect to discovery requests, Rule 26(e)(2) imposes a duty to "amend a prior response if the party obtains information upon the basis of which ... the party knows that the response was incorrect" at the time it was made. Assuming such a continuing duty under both Rules 11 and 26, the Court is aware of no information with respect to defectiveness in Anden's possession at any time prior to the date of trial that rendered its responses violative of Rules 11 and 26(g). Up to the time of trial, Anden had a reasonable basis for denying that construction defects caused the deterioration. With respect to a manufacturing defect, given the statistics available on the low national rate of FRT plywood failure and the test results that manufacturers of the plywood were claiming, a "reasonable attorney in [Anden's] ... circumstances could believe" that denying manufacturing defects was "factually ... justified." *Cabell v. Petty*, 810 F.2d at 466.

12. Plaintiff's Second Set of Requests for Admission, dated December 29, 1989, at ¶¶ 15–16. *See* Va.Code § 55–79.79(b) (requiring seller of condominium unit to "warrant or guarantee, against structural defects, each of the units for two years from the date each is conveyed, and all of the common elements for two years").

13. Complaint, ¶ 7.

14. *See* Plaintiffs' Second Set of Requests for Admissions, dated December 29, 1990, ¶ 13 and ¶ 14, stating:

13. The strength of most or all of the fire retardant treated plywood in the roofs at Water's Edge, A Condominium, has been reduced below accepted safety standards.

14. The fire retardant treated plywood in the Water's Edge roofs requires replacement.

Edge had deteriorated to the point of being unsafe. Moreover, on March 21, 1990, Anden served a supplemental answer to certain expert interrogatories propounded by Water's Edge in which Anden stated that its retained expert would "testify that the FRT plywood samples examined by him at Water's Edge and tested by [Wiss, Janney] have suffered from ... thermal degradation process, and as a consequence have lost substantial structural strength and must be replaced." [15] On the first day of the trial on liability, Anden admitted that the plywood at Water's Edge would have to be replaced. The Court concludes, therefore, that at some point prior to trial Anden should have admitted that the FRT plywood at Water's Edge was deteriorated and needed to be replaced.[16]

Anden maintains that its supplemental answer to Water's Edge's expert interrogatory is the equivalent of an admission. This is not so. Water's Edge could not rely at trial on this answer to the same extent and in the same manner as it could on an admission by Anden that the FRT plywood at Water's Edge was in a weakened condition and needed to be replaced. For example, Anden's expert might not testify at trial, thus potentially depriving Water's Edge of this evidence of deterioration. Moreover, testimony by Anden's expert might be subjected to attack and undermined at trial by the third-party defendants. An interrogatory answer describing anticipated expert testimony is not the equivalent of Anden admitting the objectively factual results of its investigation, namely that the plywood had deteriorated and needed replacement. Anden, at least by March 21, 1990, had clear evidence of this. It should have amended its previous outright denials to Water's Edge's Second Set of Requests for Admissions, ¶¶ 13 & 14.

At Water's Edge's request, calculation of damages issues pertaining to its motion for litigation costs have been postponed pending a ruling on the motion. Water's Edge may therefore make a submission pertaining to the narrow issue of when Anden knew, or had reasonable opportunity to know, that the bulk of the FRT plywood needed to be replaced, and what costs, subsequent to that date, Water's Edge incurred solely to prove that the plywood was in a deteriorated state requiring replacement. As noted above, costs will not be permitted for acts undertaken by Water's Edge to prove that the FRT plywood had deteriorated from manufacturing or construction defects, or within two years of construction.

Accordingly, an order will issue permitting Water's Edge to submit information on when Anden learned or reasonably could have learned of the deteriorated condition of plywood at Water's Edge, and the expenses incurred subsequently by Water's Edge solely for the purpose of proving that the FRT plywood was in fact deteriorated and needed to be replaced. Anden will be afforded a reasonable opportunity to respond.

---

**15.** Defendant/Third–Party Plaintiff, The Anden Group's Supplemental Answer to Expert Interrogatory, dated March 21, 1990, at 2–3.

**16.** The current record is unclear as to when Anden was informed of Wiss, Janney's findings. *See, e.g.,* Plaintiff's Reply to Anden's Response to Plaintiff's Motion to Renew the Motion for Award of Litigation Costs, at 2–3 (indicating results were reported to Anden either in November 1989 or January 1990). While Water's Edge appears to contend that Anden may have been informed of test results by Wiss, Janney as early as November 1989, Anden maintains that Wiss, Janney only visited the site on January 19, 1990, that Anden was able to retain Wiss, Janney only at the end of January or in early March, 1990, and that the test results were received shortly before March 21, 1990. No affidavits or other documents have been received to support either party's claims.